# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2405 | **DATE** | 9/18/2003 |
| **CASE TITLE** | WIRELESS DISTRIBUTORS, INC. vs. SPRINTCOM, INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Status hearing held and continued to 10/9/03 at 9:00 a.m. Enter Memorandum Opinion And Order. Sprint's motion to dismiss is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | SEP 19 2003 date docketed | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | | 13 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 03 SEP 18 PM 5:15 | SEP 19 2003 date mailed notice | |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| WIRELESS DISTRIBUTORS, INC., an Illinois corporation, ) ) ) | |
| Plaintiff, ) ) | |
| ) | No. 03 C 2405 |
| v. ) ) | |
| ) | Judge John W. Darrah |
| SPRINTCOM, INC., a Kansas corporation d/b/a ) SPRINT PCS, ) ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Wireless Distributors, Inc., filed suit against Defendant, Sprintcom, Inc. d/b/a Sprint PCS, alleging breach of contract and fraudulent misrepresentation. Presently pending before the Court is Sprint's Motion to Dismiss Count II of the Counterclaims.

A reading of Wireless's Complaint supports the following summary of the alleged operative conduct of the parties.

On April 12, 2001, Sprint and ABC Wireless entered into a Distribution Agreement whereby ABC agreed to purchase Sprint telephones, related accessories, and other tangible goods from Sprint for sale to consumers and small business endusers through ABC's physical retail store. Section 2.1 of the Distribution Agreement provided that the term of the Distribution Agreement was one year from the effective date, unless terminated sooner. The Distribution Agreement automatically renewed for consecutive one-year terms unless either party gave the other party written notice of non-renewal at least thirty days before the anniversary of the effective date. Section 18 provided that Sprint could terminate the Distribution Agreement for any reason in its sole discretion upon thirty days' prior written notice to ABC or if ABC violated

Section 3.7 of the Distribution Agreement.

Pursuant to Section 3.1 of the Distribution Agreement, ABC agreed not to use independent contractors, franchises, dealers or other distributors to sell the Products. Section 3.7 of the Distribution Agreement provided that ABC was only authorized to sell the Products in the stores listed in Exhibit A of the Distribution Agreement and not through any other distribution channel. The Distribution Agreement provided for certain types and levels of compensation to be paid to ABC. Sprint could modify the compensation paid to ABC upon thirty days' written notice pursuant to Section 10.4.

Section 20.8 of the Distribution Agreement provided that the laws of the State of Kansas govern the Distribution Agreement, including its validity, the construction of its terms, and interpretation of the rights and duties of the parties to the Distribution Agreement.

In May 2001, ABC assigned its rights under the Distribution Agreement to Wireless. Sprint consented to the assignment and did business thereafter with Wireless pursuant to the terms of the Distribution Agreement and pursuant to the understanding reached between the parties prior to the assignment.

In April 2001, prior to the assignment, Ronald Goldberg, Wireless's President, and Keith Kim, Wireless's then Vice-President, informed Marlene Perez, Sprint's Account Representative for ABC, that Wireless did not own any retail stores and would be selling the Products to dealers and their subdealers nationwide. Wireless only had a warehouse with an office facility in Lincolnshire, Illinois. Shortly after this discussion, Perez visited Wireless's warehouse from which Wireless intended to sell the Products to its dealers and their subdealers. Based on the conversation and visit, Sprint knew and understood, prior to the assignment, that Wireless would

be selling the Products to its dealers and their subdealers nationwide and not directly through any retail stores, except the retail store owned by ABC that was listed in Exhibit A of the Distribution Agreement. Furthermore, through the course of dealings between Sprint and Wireless, including face-to-face meetings, telephone conversations and electronic correspondence, Sprint knew and understood that Wireless was selling Products to its dealers and their subdealers.

In February 2002, Sprint advised Wireless that it was in the process of changing the compensation structure for all of its indirect distributor channels, effective April 1, 2002. On March 1, 2002, Susan Cheney, Sprint's Chicago Area Vice-President, informed Goldberg by letter that Sprint was changing Wireless's compensation structure under the Distribution Agreement, effective April 1, 2002. On March 6, 2002, Cheney informed Kim that Sprint was changing Wireless's compensation structure under the Distribution Agreement, effective April 1, 2002.

Enclosed in the March 1 and March 6, 2002 letters was an amendment to the Distribution Agreement. Section 4 of the Amendment provided that, beginning April 1, 2002, Wireless's sole compensation under the Distribution Agreement would be based on an exhibit attached to the Amendment known as the "Compensation Addendum".

The Compensation Addendum provided for various components of compensation to Wireless, including: (1) that Wireless agreed that it would sell, market, and promote the Products and not, directly or indirectly, sell, market, solicit, promote or act as an agent for any other wireless telecommunication product or service; (2) Wireless was entitled to a commission of $15.00 per Sprint telephone activation for being an exclusive seller, marketer, and promoter of the Products; (3) Wireless was entitled to a certain commission based upon the number of Sprint

3

telephone activations per month; (4) Wireless was entitled to certain commission based upon the type of service plans that individuals purchased with their Sprint telephones; and (5) Wireless was entitled to a 10% discount from invoice ("DFI") on all the Products Wireless purchased from Sprint. The compensation structure outlined in the Compensation Addendum provided for a higher level of compensation to Wireless than under the original compensation structure provided for in the Distribution Agreement.

Pursuant to the Distribution Agreement, Wireless had the right to either accept the Compensation Addendum and continue to do business with Sprint or to decline the Compensation Addendum and terminate the Distribution Agreement, effective April 1, 2002.

In addition to changing Wireless's compensation under the Distribution Agreement, the Amendment deleted Sections 8, 9, 10.1, and 10.2 of the Distribution Agreement and amended Section 11 of the Distribution Agreement. The Amendment did not delete or modify Section 6.2 of the Distribution Agreement, which provided that Wireless was to receive an 8% DFI on all Products Wireless purchased from Sprint.

Notwithstanding the 8% DFI provided for in Section 6.2 of the Distribution Agreement, Sprint historically allowed Wireless a 10% DFI on all Products Wireless purchased from Sprint. In that regard, on August 29, 2001, Cheney advised Kim, via a letter, that as of May 25, 2001, Sprint determined that Wireless would be paid a 10% DFI on all the Products that Wireless purchased from Sprint, effectively amending Section 6.2 of the Distribution Agreement.

During the months of February and March 2002, Kara Grady, Wireless's General Manager, and Goldberg had multiple conversations with Kris Willing, Sprint's Indirect Sales Manager, and Tina Blake, Sprint's Account Executive for Wireless, regarding the new

4

compensation structure provided for in the Compensation Addendum. During this time, Goldberg and Grady questioned Willing and Blake regarding the manner in which Wireless would be compensated for approximately 8,000 unactivated Sprint telephones in Wireless's current inventory, including those Sprint telephones located at its dealers and their subdealers, and the inventory that Wireless would purchase prior to April 1, 2002. Wireless inquired about this in order to make a decision as to whether to agree to the new compensation structure and whether to continue to do business with Sprint.

On March 12, 2002, Willing and Blake of Sprint and Grady and Goldberg of Wireless had a meeting at Wireless's office in Lincolnshire, Illinois. At the meeting, Willing informed Grady and Goldberg that Wil Luck, Sprint's North Region Director, had instructed Willing to inform Wireless that Sprint had no way of tracking the activations of Sprint telephones purchased prior to April 1, 2002, versus telephones purchased after April 1, 2002. Therefore, all activations occurring on or after April 1, 2002, would be paid at the higher compensation structure provided for in the Compensation Addendum. In reliance on this representation, Wireless agreed to the Amendment and the Compensation Addendum and agreed to continue to do business with Sprint.

From April 1, 2002 through December 1, 2002, Wireless also purchased Products from Sprint, sold them to dealers and their subdealers. These Products included Sprint telephones that Wireless had in its inventory that were purchased prior to April 1, 2002, and that Wireless expected to be paid pursuant to the new compensation structure.

In August 2002, Sprint advised Wireless that Sprint was holding a training seminar regarding its Vision handsets. Wireless inquired whether Sprint would allow Wireless's dealers

to attend the training seminar. Sprint allowed Wireless's dealers to attend the training seminar.

On October 31, 2002, Luck informed Goldberg that Sprint was terminating the Distribution Agreement, effective December 1, 2002. Luck did not indicate a reason for the termination.

From the date of the assignment through the termination of the Distribution Agreement, Sprint and Wireless continued their business relationship wherein Wireless purchased the Products from Sprint, Wireless sold the Products to its dealers and subdealers nationwide, and Sprint made payment to Wireless pursuant to the compensation structure provided in the Distribution Agreement. At no time prior to the termination of the Distribution Agreement did Sprint claim that Wireless breached the Distribution Agreement by selling the Products to its dealers and their subdealers.

As of December 1, 2002, Wireless is owed $302,174.81 from Sprint pursuant to the terms of the Distribution Agreement and the compensation structure provided for in the Compensation Addendum.

In reviewing a motion to dismiss, the court reviews all facts alleged in the complaint and any reasonable inferences drawn therefrom in the light most favorable to the plaintiff. *See Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000) (*Marshall-Mosby*). A plaintiff is not required to plead the facts or the elements of a claim, with the exceptions found in Federal Rules of Civil Procedure 9. *See Swierkiewicz v. Sorema*, 534 U.S. 506, 511 (2002) (*Swierkiewicz*); *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002). A filing under Federal Rules of Civil Procedure need not contain all the facts that will be necessary to prevail. It should be "short and plain", and it suffices if it notifies the defendant of the

principal events. *See Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003). Dismissal is warranted only if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The simplified notice pleading relies upon liberal discovery and summary judgment motions to define disputed issues and facts and to dispose of unmeritorious claims. *See Swierkiewicz*, 534 U.S. at 513.

However, "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). In order to survive dismissal, the plaintiff must plead the who, what, when, and where of the alleged fraud. *See Lachmund v. ADM Investor Serv., Inc.*, 191 F.3d 777, 782 (7th Cir. 1999) (quotations omitted). "The allegations must be specific enough to provide the defendants with a general outline of how the alleged fraud scheme operated and of their purported role in the scheme." *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 347 (N.D. Ill.1997) (citations omitted). To determine whether counts are sufficiently pled, a court will bear in mind the purposes of Rule 9(b): "(1) protecting the defendants' reputations; (2) preventing fishing expeditions; and (3) providing adequate notice to the defendants." *Rohlfing*, 172 F.R.D. at 347 (citing *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir.1994)).

The instant case is based on diversity jurisdiction. Federal courts look to the choice-of-law rules of the forum state when exercising diversity jurisdiction. *West Suburban Bank of Darien v. Badger Mut. Ins. Co.*, 141 F.3d 720, 724 (7th Cir. 1998). Illinois law defers to the contractual choice-of-law provision if such is provided in the contract. If the contract does not contain a choice-of-law provision, the court reverts to the choice-of-law rules provided by Illinois

common law. See *Diamond State Ins. Co v. Chester-Jensen Co.*, 243 Ill. App. 3d 471, 611 N.E.2d 1083, 1093 (1993).

The Distribution Agreement contains a choice-of-law provision, providing that the agreement shall be construed and governed in accordance with the laws of the State of Kansas. Accordingly, Kansas law is applied to the breach of contract claim.

Sprint contends that Wireless's breach of contract claim fails as a matter of law because Wireless is seeking compensation for sales to its dealers and subdealers, which is specifically prohibited by the Distribution Agreement via Sections 3.1 and 3.7 of the Distribution Agreement. Furthermore, the parol-evidence rule prohibits the introduction of extrinsic evidence, such as course of dealing, to contradict the terms of a fully integrated written agreement.

Under Kansas law, when a contract is complete, unambiguous, and free from uncertainty, any parol evidence of prior or contemporaneous agreements or understandings tending to vary the terms of the contract evidenced by the writing is not admissible. *See Simon v. National Farmers Org., Inc.*, 250 Kan. 676, 679-80 (1992) (*Simon*). In other words, " a party may not rely on evidence of prior or contemporaneous verbal statements to contradict the terms of a written agreement." *Ramada Franchise Sys., Inc. v. Tresprop, Ltd.*, 188 F.R.D. 610, 613 (D. Kan. 1999) (*Ramada*). Evidence of prior agreements, course of dealing and course of performance can be used to explain or supplement existing terms; however, they cannot be used to contradict the terms of a fully integrated written contract. *See Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, 452-53 (1992).

Wireless argues that the Complaint alleges that Sprint waived any rights it had relating to Sections 3.1 and 3.7 of the Distribution; thus, the parol-evidence rule is not applicable.

8

Under Kansas law, a contract or portion of a contract may be modified or waived. The Kansas Code, which adopts the Uniform Commercial Code, provides, in pertinent part, that "[a] signed agreement which excludes modification ... by a signed writing cannot be otherwise modified.... K.S.A. § 84-2-209(2). However, if an attempt at modification does not satisfy Section 84-2-209(2), it can still operate as a waiver. K.S.A. § 84-2-209(4). "Waiver in contract law implies that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with the contractual right." *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 221 Kan. 523, 526 (1977) (*Wild West*).

In the instant case, the Distribution Agreement provides that any modification or waiver must be in writing and signed by both parties. Wireless concedes that the Distribution Agreement was not modified or waived in writing by the parties.

However, the allegations in the Complaint sufficiently plead that Sprint waived enforcement of Sections 3.1 and 3.7 of the Distribution Agreement. Sprint continued doing business with Wireless with the knowledge that Wireless sold the Products to its dealers and subdealers and that this was the predominate way in which Wireless conducted its business. Sprint also trained some of Wireless's dealers. Furthermore, Wireless alleges that Sprint had compensated Wireless for the Products sold to its dealers and subdealers during at least part of the time that the Distribution Agreement was effective. These allegations also sufficiently plead that Sprint not only waived Section 3.1 and 3.7 of the Distribution Agreement but also the provisions requiring that any waiver be in writing. *See Lone Mountain Prod. Co. v. Natural Gas Pipeline Co. of Am.*, 984 F.2d 1551, 1557 (10th Cir. 1992) (finding that parties may waive the

9

terms of the contract despite contractual provisions to the contrary); *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198, 202 (7th Cir. 1985) (parties can also waive the requirement that any waiver be in writing); *Guzman v. Ugly Duckling Car Sales of Texas*, 63 S.W.3d 522, 528 (Tex. App. Ct. 2001) (non-waiver clause can be waived just as any other contractual provision can be waived); *see also Atkins v. Orkin Extermination Co.*, 5 Kan. App. 2d 739, 744 (1981) (party waived written notice requirement).

Wireless also argues that Sprint is estopped from using Sections 3.1 and 3.7 of the Distribution Agreement to dismiss Count I.

"Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. (Citation omitted)." *Wild West*, 221 Kan. at 527.

Taking the allegations of breach of contract contained in the Complaint as true and drawing all reasonable inferences therefrom, Wireless has sufficiently pled that Sprint is equitably estopped from using Section 3.1 and 3.7 of the Distribution Agreement to support the dismissal of Count I.

Sprint also seeks to Dismiss Count II for failure to state a claim. The parties dispute whether Kansas or Illinois law applies to Count II.

In determining the breadth of a contractual choice-of-law provision, courts generally look

to the language of the choice-of-law provision to determine if the parties intended the provision to govern all claims between them. *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 862 (N.D. Ill. 2002) (*Medline*). However, the parties' intent is not determinative. *Birnberg v. Milk Street Residential Assoc. Ltd.*, 2003 WL 151929 (N.D. Ill. Jan. 21, 2003) (*Birnberg*). For example, tort claims, such as fraudulent inducement, that are dependent upon a contract are subject to the contract's choice-of-law provision regardless of the breadth of the clause. *See Medline*, 230 F. Supp. 2d at 862. In determining whether a tort claim is dependent upon the contract, courts examine whether: (1) the claim alleges a wrong based on the construction and interpretation of the contract, (2) the tort claim is closely related to the parties' contractual relationship, and (3) the tort claim could exist without the contractual agreement which contains the choice-of-law provision. *See Birnberg*, 2003 WL 151929 at * 14.

Here, the Distribution Agreement contained a choice-of-law provision that states, in pertinent part, that the "internal laws of the State of Kansas (without regard to principles of conflict of law) will govern this Agreement, including its validity, the contraction of its terms and the interpretation of the rights and duties of the parties under this Agreement." This choice-of-law provision does not indicate an intent by the parties that the law of the State of Kansas shall apply to all disputes between the parties. Accordingly, the Court must review the above factors to determine if the fraudulent inducement claim is dependent upon the Distribution Agreement.

The fraudulent inducement claim does allege a wrong based upon the interpretation and construction of the Distribution Agreement, the Amendment, and the Compensation Addendum. The Complaint alleges that Wireless was concerned how it would be compensated for thousands of phones that were in its inventory because the Distribution Agreement, the Amendment, and

11

the Compensation Addendum were silent on the issue. Based on alleged fraudulent statements by Willing, Wireless was induced to execute the Amendment and to continue to do business with Sprint. Accordingly, the alleged misrepresentation will play a key role in interpreting the Amendment and the Compensation Addendum.

The fraudulent inducement is also clearly related to the parties' contractual relationship.

Lastly, the fraudulent inducement claim could not exist without the Amendment to the Distribution Agreement. As alleged, but for the misrepresentation, Wireless would not have agreed to the Amendment and the Compensation Addendum and would not have continued to do business with Sprint.

Based on the above, the fraudulent misrepresentation claim is governed by the choice-of-law provision of the Distribution Agreement; and Kansas law is applied.

Sprint argues that Wireless's fraudulent misrepresentation claim fails as a matter of law because Wireless is barred from introducing any evidence of the alleged fraudulent statements by the parol-evidence rule.

As discussed above, the parol-evidence rule provides that when a contract is complete, unambiguous, and free from uncertainty, any evidence of prior or contemporaneous agreements or understandings tending to vary the terms of the contract evidenced by the writing is not admissible. *See Simon*, 250 Kan. at 679-80. However, Kansas recognizes an exception to the parol-evidence rule for cases of fraud. *See Terry Bivens Const. Co. v. Southwestern Bell Tele. Co.*, 1993 WL 112986 (D. Kan. March 5, 1993). In order for the evidence to be admissible under the fraud exception, the evidence must tend to establish some independent fact or representation, some fraud in the procurement, or some breach of confidence, and not a promise directly at

12

variance with the promise of the writing. *See Ramada*, 188 F.R.D. at 614. Furthermore, boilerplate integration clauses that do not specifically disclaim reliance on oral representations do not bar parol evidence to show fraudulent inducement. *See Ramada*, 188 F.R.D. at 616; *Miles Excavating, Inc. v. Rutledge Backhoe & Septic Tank Serv., Inc.*, 23 Kan App. 2d 82, 84 (1997) (*Miles*) ("parol evidence is admissible to show fraud in the inducement of a contract even where the contract contains a provision stating the parties have not relied on any representations other than those contained in the writing").

Wireless's fraudulent inducement claim alleges that Willing made false representations to Wireless representatives that Wireless would be compensated pursuant to the new, and more lucrative, Compensation Addendum for Sprint phones that were purchased by Wireless before April 1, 2002. Instead, Sprint paid Wireless for activations that occurred on Sprint telephones purchased before April 1, 2002, at the old compensation structure provided for in the Distribution Agreement. The Distribution Agreement, Amendment, and Compensation Addendum are silent as to how Wireless would be compensated for activations occurring on and after April 1, 2002, on Sprint phones in the possession of Wireless, its dealers, and its subdealers prior to April 1, 2002. Accordingly, Wireless's allegations are not directly contradictory to the language of the Distribution Agreement. *See Ramada*, 188 F.R.D. at 615; *Miles*, 23 Kan. App. 2d at 84.

Lastly, Sprint contends that Wireless failed to adequately plead the requirements under Rule 9 regarding a claim of fraud.

A review of the above summary of Wireless's Complaint demonstrates that Wireless has sufficiently alleged the who, what, when, and where of the alleged fraud. The allegations set forth who was involved in the alleged fraud, what statements were made, when the statements

were made, and where the alleged fraud took place.

For the reasons stated above, Sprint's Motion to Dismiss is denied.

Dated: September 18, 2003

JOHN W. DARRAH
United States District Judge